The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Willis. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, with the exception of a few minor technical modifications.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act, with the defendant employing three or more regular employees.
2. Defendant is self-insured under the provisions of the North Carolina Workers' Compensation Act.
3. At all times pertinent hereto, there was an employee-employer relationship between the plaintiff and the defendant.
4. On 18 May 1989 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer.
5. Plaintiff has not worked for the defendant from 18 May 1989 and continuing through the date of the hearing.
6. Defendants paid temporary total disability compensation to plaintiff for the period of time from 18 May 1989 through 27 July 1990, with total payments of $11,774.73.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. At the time of the hearing plaintiff was 31 years old, with a date of birth of 28 May 1962. For her education, plaintiff had completed eleven and a half years of high school and had taken one year of college courses in Business Administration. Plaintiff's work history was as follows: plaintiff began working as a manager at a bait and tackle shop where she gained experience in management by keeping books and overseeing the operations of the shop. Plaintiff left her first job in 1982 because of a pregnancy. In 1983 plaintiff began to work as a truck driver. In May 1983 she began to work as a truck driver for Transco Logistics, Inc.; and in December 1984 she began to work as a truck driver for Pacemaker Driver Service. While with Pacemaker Driver Services, plaintiff and her husband drove long-distance hauls as a team. After working for Pacemaker Driver Services for about seven months, plaintiff sustained a work-related injury by accident to her back (plaintiff 23 years old). Following the accident, plaintiff was out of work and receiving workers' compensation for about three years, from July 1985 through April 1988. In June 1988 plaintiff returned to work at a fast food restaurant. She worked for the restaurant for about one year as an assistant manager; and when she left the restaurant, she was being trained as a district manager. On 2 May 1989 plaintiff began to work for this defendant as a driver sales person. She worked for this defendant for about two weeks when she sustained the admittedly compensable injury which is the subject to this claim.
2. For her medical history before beginning work for this defendant, plaintiff had suffered from migraine headaches. In August 1986 (about a year after her first accident) plaintiff reported to Dr. R. G. Senter that she had a history of migraine headaches which were rather severe, but she had not had a headache for eighteen months. At the time of this report, plaintiff had been out of work for a year and would continue to be out of work for approximately two more years.
3. Plaintiff was first injured at work in July 1985 (while working for another employer). The accident occurred when plaintiff was switching trailers, and she felt a pop in her back as she pulled out a large pin. This accident did not cause any nerve root impingement in plaintiff's spine, and plaintiff never required surgery. The results of a CT scan and EMG's were within normal limits. Plaintiff reported a variety of physical problems which she claimed were caused by the accident. These problems included pain in the upper, the mid, and the lower back. Plaintiff's several doctors kept her out of work for about three years, except for two attempts to return to work in October 1985 and January 1986, after which plaintiff left following very short periods of work, claiming she was unable to perform her job.
4. In April 1988 plaintiff settled her first workers' compensation claim for a lump sum and for $1,900.00 per year for four years. Within two months later, in June 1988, plaintiff returned to work at the fast food restaurant, although she had been unable to find any job within her restrictions for the prior three years.
5. In May 1988 shortly after settlement, but before her return to work, plaintiff injured her back in a domestic dispute. Plaintiff was sitting on the hood of a car when her husband drove off at a high rate of speed and threw plaintiff from the hood. Between 14 May 1988 and 3 September 1988 plaintiff sought medical treatment from Ebenezer Medical Center for this back problem. As a result of being thrown from the car, plaintiff strained her back and suffered multiple contusions. After the last examination in September 1988, plaintiff was given medication; however, she was able to return to work about one month after the incident, while still receiving treatment. The last treatment was rendered about eight months before the accident of 18 May 1989, the subject of this claim.
6. On 20 April 1989 plaintiff applied for the job with this defendant. On her application plaintiff did not report that she had injured her back in the domestic dispute, and she was untruthful in relating the facts of her prior work-related accident. Plaintiff reported that she had injured her back in 1985, but she reported that it was a "medical only" claim. Plaintiff did not report that she had been out of work for three years after the accident, and she did not report any permanent restrictions in her activity, and she did not report any history of migraine headaches.
7. Before she began to work for this defendant, plaintiff was given a pre-employment physical examination. Following the examination, plaintiff was given medical approval to perform the job for which she applied. Plaintiff had applied for a job with fairly strenuous duties. She would drive a truck to grocery stores where she would deliver bread to the store and remove old bread from the store. The bread would be carried to and from the store in a metal rack which was taller than she was. Although plaintiff was given medical approval to perform this job, the undersigned finds limited weight in the approval because it is based, at least in part, on a highly inaccurate medical history.
8. For the first two weeks with defendant, plaintiff was a trainee, learning the job duties and her route. After two weeks, plaintiff was made a permanent employee; and on 18 May 1989, plaintiff had been a permanent employee for only three days. Although she was no longer a trainee, plaintiff continued to work with a co-worker on her route.
9. On 18 May 1989, plaintiff, who was 26 years old, was pushing a rack of bread away from one of the stores on her route. The rack was about six feet high and weighed about 100 pounds and plaintiff was five feet seven and 134 pounds. Before she reached her truck one of the wheels on the rack was caught in a crack on the pavement and the rack began to topple over. Plaintiff grabbed the top of the rack to keep it from falling over. The rack continued to fall and pulled plaintiff over with it. This incident was an admittedly compensable injury by accident.
10. Plaintiff was able to complete her job duties on that day, but the next day plaintiff began to experience soreness in her neck, both arms, both shoulders, her back and her head. Plaintiff sought medical treatment from Prime Care. At this examination, there were no muscle spasms; and a straight leg raising test produced only slight pain in the lower back. Plaintiff was given medication and a return appointment in two days. On her return plaintiff reported tingling in both arms and tenderness in her upper and lower back. The results of the straight leg raising test were positive bilaterally only at 45 degrees. Plaintiff was referred to Dr. Kenneth Clonninger, a neurosurgeon.
11. On 25 May 1989 (about a week after the accident) plaintiff was examined by Dr. Robert Nudelman, a neurosurgeon and partner with Dr. Clonninger. Dr. Nudelman and his partners were plaintiff's primary treating physicians for about three months. During this initial three months after her accident, plaintiff did not report headaches. At this time plaintiff suffered from lumbar and cervical strains caused by the accident of 18 May 1989. The results of an MRI were normal for the cervical spine and showed mild degeneration of the lumbar spine. The result of physical examinations were generally within normal limits, with the straight leg raising test results remaining negative at 90 degrees; and on one occasion Dr. Nudelman wrote: "there is somewhat poor effort and a tendency toward giveaway weakness." In June 1989 Dr. Nudelman was of the opinion that plaintiff could probably return to work, but that the activity could exacerbate her discomfort. In July 1989 Dr. Clonninger was of the opinion that plaintiff should be able to return to work shortly, but plaintiff reported an exacerbation of her pain while scrubbing pots at home. On 2 August 1989, Dr. Clonninger wrote: "I don't really know why she has continued to have as much discomfort as she had"; and Dr. Clonninger referred plaintiff to Dr. William Rowe, a rheumatologist.
12. On 11 September 1989 plaintiff was examined by Dr. John Moore, a partner with Dr. Rowe. At this examination plaintiff did not report headaches, and the results of the HEENT examination were benign. Plaintiff reported pain primarily in the neck, arms and shoulders. Dr. Moore diagnosed fibrocytis and prescribed medication.
13. On 2 November 1989 (five months after the accident) plaintiff was examined by Dr. Rowe. At this examination plaintiff did not complain to Dr. Rowe of headaches. Her complaint was of pain in the neck, shoulders and arms. Dr. Rowe referred plaintiff to a neurologist for biofeedback therapy. Dr. Rowe wrote: "other than that [biofeedback] I don't think we have much else to offer her; and as far as her working ability is concerned, we will continue to support her disability, somewhat arbitrarily, until we see her back in six to eight weeks." At the return appointment on 28 December 1989 plaintiff again did not complain of headaches, but complained of pain in the neck and upper shoulders. There were no objective indications of anything wrong with plaintiff, and the only support for her claim was her subjective complaints of pain.
14. Dr. Rowe referred plaintiff to the headache center at Guilford Neurological Associates for biofeedback. Plaintiff had not complained to Dr. Rowe of headaches, but the headache center is where biofeedback therapy was given. Between 15 November 1989 and 6 February 1990 plaintiff received 20 treatments from Nancy Yow, a neuromuscular therapist. On 26 January 1990, following the seventeenth treatment, Ms. Yow first discussed headaches in her notes. Ms. Yow wrote that plaintiff had suffered from "can-ignore headaches," which had improved over the last week. On 2 February 1990 at the nineteenth session plaintiff again reported "can-ignore headaches." At the last session on 6 February 1990 plaintiff reported "bad headaches for a week." Ms. Yow was not an employee of Guilford Neurological Associates, but worked for the organization as an independent contractor performing biofeedback therapy. Although her notes are dated from 1989 and early 1990, the letterhead under which these notes are written did not become the letterhead of Guilford Neurological Associates until approximately two years later. The reason the notes and the letterhead are not consistent is unknown; however, the notes could have been on a computer disc, and printed two years after they were written, although that would not explain one of the notes which is hand written.
15. On 9 February 1990, three days after the last treatment for biofeedback, plaintiff had a serious motor vehicle accident. Plaintiff's car was struck from behind and thrown into the car in front of it. In the motor vehicle accident plaintiff injured her upper, mid and lower back; and she injured her knees and left ankle, which hit the dashboard.
16. Three days after the motor vehicle accident plaintiff was examined by Dr. Gioffre, an orthopedist. At this time plaintiff had an acute cervical strain. Dr. Gioffre referred plaintiff back to Dr. Rowe to compare her condition before and after the motor vehicle accident. However, plaintiff did not return to Dr. Rowe.
17. Plaintiff's attorney referred her to Russell Cobb, a chiropractor. The first examination by the chiropractor was on 15 February 1990. At this time plaintiff reported constant pain in her neck and shoulders, and constant headaches and earaches. Plaintiff reported that these problems, and many others, were caused by the motor vehicle accident of February 1990. The chiropractor referred plaintiff to Dr. Kenneth Willis, a neurologist.
18. The first examination by Dr. Willis was on 26 February 1990. While the results of the physical examination were normal, Dr. Willis diagnosed a cervical strain. Plaintiff reported constant headaches which began when she woke in the morning and continued until she went to bed at night. Plaintiff told Dr. Willis that she was receiving treatment from Dr. Rowe for bursitis in her right shoulder which she had received in a work-related accident in May 1989. Plaintiff did not attribute any other condition to the work-related accident, and Dr. Willis prescribed medication and nerve conduction studies.
19. On 15 March 1990 plaintiff returned to Dr. Willis. The results of the EMG and nerve conduction studies were within normal limits. Plaintiff reported that she was much improved since her prior examination, but she complained of pain in her left neck and arm. Plaintiff did not complain of knee pain or headaches. Plaintiff did not return to Dr. Willis between March 1990 and October 1990. The insurance administrator wrote Dr. Willis on 10 May 1990 and asked if Dr. Willis could give a return to work date. Dr. Willis responded that plaintiff could return to work at light duty on 1 June 1990.
20. Between March 1990 and May 1991 plaintiff received approximately 50 treatments from her chiropractor.
21. In May 1990 plaintiff's attorney referred her to Dr. James Aplington, an orthopedic surgeon. Dr. Aplington was in the same office as Dr. Gioffre. The first examination by Dr. Aplington was on 7 May 1990. Plaintiff did not report constant headaches to Dr. Aplington, but reported problems with her knees, primarily her left knee. Dr. Aplington performed arthroscopic surgery to her left knee on 31 May 1990. During this surgery Dr. Aplington performed a partial medial meniscectomy on the left knee. Plaintiff recovered very well following this surgery.
22. On or about 25 May 1990 plaintiff sustained a second motor vehicle accident. Plaintiff was in a parking lot when she was struck from behind by another car. Following this incident plaintiff's neck and mid back were sore. Plaintiff reported this motor vehicle accident to her chiropractor, but did not report it to any other doctors.
23. Plaintiff returned to Dr. Aplington in August 1990 with three complaints: 1) problems with her left knee, although improved since surgery; 2) problems with her right knee, and 3) problems with her left ankle. Plaintiff did not report headaches. Dr. Aplington performed surgery on plaintiff's right knee on 24 August 1990. At this time plaintiff suffered from traumatic synovitis, and Dr. Aplington performed synovectomy and excision of the suprapatellar plica.
24. After the surgery, plaintiff returned to Dr. Aplington on 31 August 1990. There were two reasons for this examination, the first was continuing problems with her knees, and the second was continuing problems with her neck and back. Initially, plaintiff told Dr. Aplington that she had not had prior problems with her neck and back before the motor vehicle accident in February 1990; but after further discussions, she told Dr. Aplington of her prior work-related injuries in 1985 and 1989. Plaintiff told Dr. Aplington that after the May 1989 accident she had suffered from headaches and muscle contractions and received treatment from Dr. Willis (although plaintiff received treatment from a neuromuscular therapist in Dr. Willis's office, the actual treatment by Dr. Willis did not begin until after the motor vehicle accident in February 1990). Plaintiff also told Dr. Aplington that she was better by May 1990 (when Dr. Aplington first examined plaintiff), but had developed progressive low back and left leg pain. Plaintiff did not report that she was having headaches at the time of the August 1990 examination. Dr. Aplington diagnosed cervical and lumbar sprains and ordered a myelogram/CT scan.
25. The myelogram/CT scan was performed on 5 September 1990. At this time there was no significant abnormalities of the lumbar or cervical spine. Plaintiff did not return to Dr. Aplington for six months.
26. On 4 October 1990 plaintiff returned to Dr. Willis. Plaintiff told Dr. Willis that in June 1990 her cervical pain and headaches began to worsen and had gradually increased since that time. At this time plaintiff suffered from post-traumatic tension-type headaches and whiplash cervical injury. Dr. Willis ordered an MRI. At the time of the MRI there was no significant abnormality of the cervical spine. Dr. Willis repeated the EMG/nerve conduction studies; and at the time of these tests, there was no significant neuro-abnormality. From October 1990 to March 1991 plaintiff received treatment from Dr. Willis which included medication and biofeedback therapy.
27. Between her injury in May 1989 and November 1990, plaintiff divorced Mr. Ludlam and married Mr. Crouse. In November 1990 plaintiff and her second husband opened a bicycle shop in a small building next to plaintiff's father's insurance agency. Plaintiff worked at the bicycle shop waiting on customers and keeping books. Plaintiff's second husband claims to be disabled due to a chemical imbalance and was receiving social security benefits.
28. Following her divorce, custody of plaintiff's two minor children went to their father, plaintiff's first husband. Plaintiff was ordered to pay $75.00 per week in child support. Plaintiff sought to discontinue child support on the grounds that she was disabled and could not make the payments. Mr. Ludlam hired a private investigator to document the fact that plaintiff and her second husband had opened the bicycle shop and that plaintiff was working there. Plaintiff's child support obligations were not terminated.
29. On 1 March 1991 plaintiff returned to Dr. Aplington with complaints of her left ankle giving away. Dr. Aplington performed a modified Watson-Jones ankle reconstruction in April 1991. Plaintiff continued to have problems with her left ankle through about August 1991.
30. In May 1991 plaintiff returned to Dr. Willis with complaints of right shoulder pain, continuing headaches and cervical whiplash. At this time there was noticeable crepitus in the right shoulder. Plaintiff went to Dr. Aplington in June 1991 for her right shoulder, and at this time there was no significant abnormality of the shoulder. Dr. Aplington recommended that plaintiff avoid vigorous motions which were required to reproduce the grinding in the shoulder.
30. On 2 July 1991 plaintiff settled her motor vehicle accident claim for $25,000.00.
31. On 11 July 1991 and 14 August 1991 hearings were held in South Carolina regarding plaintiff's attempt to terminate her child support payments.
32. On 31 July 1991 plaintiff went to Dr. Vincent Paul with complaints of headaches and right shoulder pain. Plaintiff attributed these problems to her work-related accident in May 1989. Plaintiff did not tell Dr. Paul of her prior 1985 accident nor of her May 1990 subsequent accident. At the time of Dr. Paul's examination plaintiff suffered from a snapping scapula and bilateral occipital neuralgia with C-2 ganglion disease. Dr. Paul injected medication into plaintiff's neck, and there was excellent relief from her headaches. Plaintiff was given an appointment to return in two weeks, but plaintiff did not keep the appointment. She would return to Dr. Paul about five months later.
33. Plaintiff returned to Dr. Willis on 11 September 1991 and was given medication for headaches and shoulder pain. Plaintiff returned to Dr. Paul on 4 December 1991 (third child support hearing was on 10 December 1991). Plaintiff reported to Dr. Paul that she had improved after the first injection, but her headaches had recently worsened. Dr. Paul referred plaintiff to Dr. Ricky Holmberg who performed additional injections.
34. Following January 1992 Dr. Holmberg became plaintiff's primary treating physician. On 17 January 1992 Dr. Holmberg performed surgical spinal blocks at level C-2 and C-3. On 11 February 1992 Dr. Holmberg performed bilateral C-2 ganglionectomies and right C-2 -3, medial facetectomy with partial coagulation of the C-3 nerve root and ganglion without resection. Immediately following plaintiff's second surgery her headaches were completely gone. Sometime later the headaches returned, and plaintiff reported about a 50 percent improvement. Because she claimed her headaches improved when she wore a cervical collar or held her head steady, Dr. Holmberg considered a cervical fusion. Plaintiff continued treatment with Dr. Holmberg through April 1993, and did not receive any treatment between April 1993 and April 1994. Plaintiff's workers' compensation hearing was scheduled for May 1994.
35. The undersigned finds that any treatment plaintiff received for her back or her legs after 9 February 1990 was not made necessary as a result of the injury by accident of 18 May 1989. This finding is based on the fact that the final treatment plaintiff was given for her work-related accident was on 6 February 1990, and no further treatment had been recommended.
36. The undersigned finds that any treatment plaintiff received for her headaches from Dr. Paul and Dr. Holmberg was not made necessary as a result of the injury by accident of 18 May 1989. In response to hypothetical questions, plaintiff's doctors were aware of her history of migraines before her accident and were aware of her complaints of headaches three days before the motor vehicle accident in February 1990. However, the doctors were not aware of two significant facts: first, there was a second motor vehicle accident in May 1990, and secondly, there was a period of time from about March 1990 to July 1990 when plaintiff had no headaches, with the headaches returning after the second motor vehicle accident. The finding that there was a period of time after the second motor vehicle accident without headaches is supported by the records of plaintiff's chiropractor where plaintiff complained of headaches for about a month after the motor vehicle accident, then made no headache complaints during her frequent treatments, and then in July 1990 the chiropractor noted that plaintiff complained of headaches "again." In addition, plaintiff told Dr. Aplington in August 1990 that she had suffered headaches and neck pain following the motor vehicle accident in February 1990, but she was better by May 1990. Dr. Aplington first examined plaintiff on 7 May 1990; therefore, he would have been familiar with her condition at that time and no headaches were noted in his examination of 7 May 1990. The history of plaintiff's headaches is as follows: plaintiff had a history of migraine headaches before her work-related accident in 1989; plaintiff did not report headaches for at least six months after her injury by accident in 1989; plaintiff began to report headaches about two weeks before the motor vehicle accident in February 1990; plaintiff continued to report headaches for about a month after the motor vehicle accident in February 1990; plaintiff's headaches resolved by 7 May 1990; plaintiff suffered a second motor vehicle accident in May 1990 which increased her neck and mid-back pain; plaintiff's headaches returned sometime in July 1990; plaintiff continued for the next four years to have periods of time when no headaches were reported to her doctors. Any opinions given by plaintiff's doctors regarding the relationship between headaches and the injury by accident herein were based on information related to them by the plaintiff. However, these representations are not found to be credible.
37. As a result of the work-related accident of 18 May 1989, plaintiff was unable to be gainfully employed at her regular job with defendant, or any other employer, from 18 May 1989 through 6 February 1990. Following 6 February 1990 any inability of plaintiff to work was not caused by the injury by accident of 18 May 1989. Plaintiff returned to work with her husband in November 1990.
38. The injury by accident of 18 May 1989 did not cause any permanent partial impairments to plaintiff.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. As a result of the admittedly compensable injury by accident of 18 May 1989, plaintiff is entitled to temporary total disability compensation from 18 May 1989 through 6 February 1990. As these amounts have already been paid, as well as additional amounts, plaintiff is not entitled to any further temporary total disability compensation. N.C.G.S. § 97-29.
2. As a result of the admittedly compensable injury by accident of 18 May 1989, plaintiff is not entitled to any permanent partial disability compensation. N.C.G.S. § 97-31.
3. Plaintiff is entitled to the payment of all medical expenses incurred, or to be incurred, as a result of the admittedly compensable injury by accident of 18 May 1989. Said medical treatment shall not include any medical treatment plaintiff has received following 6 February 1990. N.C.G.S. § 97-25.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Plaintiff's claim for additional compensation pursuant to the North Carolina Workers' Compensation Act must be, and the same is hereby, DENIED.
2. Defendants shall pay all medical expenses incurred, or to be incurred, as a result of the injury by accident of 18 May 1989. Defendants shall not be responsible for any medical treatment provided to plaintiff following 6 February 1990.
3. Defendants shall pay the costs due this Commission for the initial hearing before the Deputy Commissioner including an expert witness fee in the amount of $200.00 to Dr. Keith Willis, $200.00 to Dr. William Rowe, $200.00 to Dr. Vincent Paul, and $350.00 to Dr. Ricky Holmberg. Each side shall bear its own costs for hearing before the Full Commission.
 S/ _______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ _____________ JAMES J. BOOKER COMMISSIONER